UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

RESIDENTS OF GORDON PLAZA, INC.,

*Plaintiff,*

v.

MITCH LANDRIEU, in his official capacity as Mayor of the City of New Orleans, and the CITY OF NEW ORLEANS,

*Defendants.*

COMPLAINT

For its complaint, Plaintiff Residents of Gordon Plaza, Inc. makes the following allegations against Defendants Mitch Landrieu, in his official capacity as Mayor of the City of New Orleans, and the City of New Orleans:

INTRODUCTION

1. This is a citizen enforcement suit under the Resource Conservation and Recovery Act, 42 U.S.C. § 6972(a)(1)(B). The case is about inhumane and dangerous living conditions that the Mayor and the City of New Orleans have imposed on residents of Gordon Plaza, which is located on the Agriculture Street Landfill. This landfill is a toxic waste dump. The City duped African-American residents into purchasing homes in Gordon Plaza by failing to disclose that the City had built the development on toxic waste and contaminated soil.

2. The Agriculture Street Landfill—as a direct result of the hazardous and solid waste it contains—is a blighted area, notable for destroyed buildings, including an abandoned school, that attract vermin and potential criminals. Living on the landfill, residents are exposed to toxic chemicals and suffer an increased risk of disease and death. The landfill poses unreasonable risks to residents and cannot support a viable community.

3. Approximately 53 occupied households are left on the Agriculture Street landfill. Several include residents who suffer from cancer and who have lost loved ones to cancer.

## JURISDICTION, VENUE, NOTICE, AND CLAIMS PROCESSING PROVISIONS

4. This Court has original subject matter jurisdiction over this case under the Resource Conservation and Recovery Act, 42 U.S.C. § 6972(a), federal question jurisdiction, 28 U.S.C. § 1331, and the Declaratory Judgment Act, 28 U.S.C. § 2201.

5. Venue is proper in the Eastern District of Louisiana pursuant to the Resource Conservation and Recovery Act, 42 U.S.C. § 6972(a) because the endangerment at issue is in this district.

6. On September 27, 2017, the Plaintiff provided Notice of Endangerment under the Resource Conservation and Recovery Act via registered mail, return receipt requested, to the Mayor and the City of New Orleans. The Plaintiff also sent this Notice to the Attorney General of the United States, the Administrator of EPA, and the state of Louisiana. The Notice is attached as Exhibit 1 and incorporated pursuant to Fed. R. Civ. P. 10(c).

7. The Defendants received the Notice of Endangerment more than 90 days ago.

8. The September 27, 2017, Notice of Endangerment put the Defendants on notice of the Plaintiff's claim.

9. The endangerment at issue in this lawsuit began after Hurricane Katrina destroyed any possibility that EPA's removal actions (which occurred during the period from 1994 through 2001) would result in a safe and viable community on the Agriculture Street Landfill. That endangerment is ongoing.

10. This lawsuit is not precluded by governmental action. Specifically, neither EPA nor a state has commenced or is diligently prosecuting an action to abate the endangerment at

issue in this lawsuit. Further, neither EPA nor a state is actually engaged in a removal action, under authority of 42 U.S.C. § 9604, to abate the endangerment at issue. In addition, neither EPA nor a state has incurred costs to initiate a remedial investigation and feasibility study under 42 U.S.C. § 9604 or is diligently proceeding with a remedial action under 42 U.S.C. § 9601, et seq., to abate the endangerment at issue. Finally, no responsible party is diligently conducting a removal action, remedial investigation and feasibility study, or proceeding with a remedial action pursuant to a judicial or administrative order obtained or issued under 42 U.S.C. § 9606, or 42 U.S.C. § 6973, to abate the endangerment at issue.

11. The Plaintiff brings this lawsuit for a lawful purpose and not with respect to siting of a hazardous waste treatment, storage, or a disposal facility or to restrain or enjoin issuance of a permit for a facility.

## PARTIES

### *Plaintiff*

12. Plaintiff Residents of Gordon Plaza, Inc. is a corporation formed to help members of the Gordon Plaza residential community. Residents of Gordon Plaza, Inc. has officers and people with indicia of membership who live on the Agriculture Street Landfill. These members seek relocation because of the harmful waste underlying their homes and their community and because hazardous and solid waste at the landfill has made it impossible for properties on the landfill to support a viable community. Residents of Gordon Plaza, Inc. is a "person" under 42 U.S.C. § 6903(15) (defining person to include a "corporation").

13. The Plaintiff's members suffer injury and threats of injury from living in a contaminated and blighted area. The area surrounding their community is largely abandoned, contaminated, and blighted because of the Defendants' disposal and handling of hazardous and

solid waste. The Plaintiff's members' enjoyment of life is impaired by their reasonable concerns that toxic contaminants may endanger their health.

14. Hazardous and solid waste at the landfill injures the Plaintiff's members by preventing them from making normal use of their properties. For example, EPA protocols impose limitations on residents with respect to digging or other activities that might result in contact with subsurface contamination.

15. EPA protocols also purport to modify utilities' normal procedures for excavation and backfill, which limits the willingness of utilities, such as cable companies, to provide services to the Plaintiff's members, and creates a risk that utility workers will fail to follow such protocols and thus spread contamination.

16. Hazardous and solid waste at the landfill injures the Plaintiff's members by impairing the ability of the community to attract investment and recover from its blighted condition.

17. Hazardous and solid waste at the landfill injures the Plaintiff's members by impairing the marketability of their homes.

18. Blight resulting from the hazardous and solid waste injures the Plaintiff's members by causing them reasonable concern that blighted buildings will attract vermin and foster crime.

19. Because the City withheld information about the contamination when it marketed homes at Gordon Plaza, all the Plaintiff's members' injuries are imposed on the Plaintiffs by the Defendants.

20. The Plaintiff's members' injuries are actual, concrete, irreparable, and traceable to the Defendants. Money damages cannot adequately remedy these injuries, which are continuing.

The Resource Conservation and Recovery Act empowers this Court to redress these injuries, *i.e.*, "to restrain any person who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste [that may present an imminent and substantial endangerment to health or the environment,] to order such person to take such other action as may be necessary, or both." 42 U.S.C. § 6972(a). The City of New Orleans is a person who is contributing to the handling and disposal of such solid and hazardous waste.

*Defendants*

21. Defendant Mitch Landrieu is Mayor of the City of New Orleans. He is a "person" as defined under 42 U.S.C. § 6903(15). He is sued in his official capacity.

22. Defendant City of New Orleans is a political subdivision of the State of Louisiana and is a "person" as defined under 42 U.S.C. § 6903(15) (defining person to include a "political subdivision of a State").

## BACKGROUND

*The Agriculture Street Landfill*

23. The Agriculture Street Landfill is in New Orleans, Orleans Parish, Louisiana. The site is bordered by Almonaster Boulevard on the west, Higgins Boulevard on the north, Louisa Street on the east, and the Peoples Avenue Canal and railroad tracks on the south. The site covers approximately 95 acres.

24. The City operated the Agriculture Street Landfill as a dump from 1909 until 1957 and reopened it for waste from Hurricane Betsy in 1965-66. During operations, the landfill was subject to spontaneous fires, sometimes blanketing the city with smoke. The Agriculture Street

Landfill was New Orleans' primary dumping ground during the 1920s and 1930s. During the 1940s and 1950s, the City sprayed the Agriculture Street Landfill with DDT.

25. The City disposed of hazardous and solid waste at the Agriculture Street Landfill.

26. Because of the City's disposal of hazardous and solid waste at the Agriculture Street Landfill, levels of dangerous chemicals are present above government standards in areas of the landfill that are accessible to the public.

27. Sampling that chemist Wilma Subra performed on the Agriculture Street Landfill site soils after Hurricane Katrina identified contaminants in excess of Louisiana Department of Environmental Quality's Risk Evaluation/Corrective Action Program (RECAP) standards, including without limitation Arsenic (13 mg/kg), Benzo(a)anthracene (900 ug/kg), Benzo(a)pyrene (1200 ug/kg), Benzo(b)fluoranthene (1200 ug/kg), and Indeno(,2,3-cd)pyrene (720 ug/kg).

28. In the 1970s through the 1980s, the City developed approximately 47 acres of the Agriculture Street Landfill for residential use. Those developments included Gordon Plaza and an elementary school, the Moton School.

29. The City marketed the homes at Gordon Plaza to African-Americans. The City represented to members of this vulnerable population that these homes represented an opportunity to become first-time homeowners and to improve their social and economic situations.

30. When the City marketed the homes at Gordon Plaza, it withheld the fact that the homes were located on top of a toxic dump.

31. The City duped African-American residents into purchasing and moving on top of contaminated property.

*EPA and Superfund*

32. Based on risks to public health and welfare, EPA listed the Agriculture Street Landfill as a Superfund Site on the National Priorities List in 1994. EPA raised concerns about the Site's contamination with arsenic, lead, and polynuclear aromatic hydrocarbons ("PAHs").

33. From 1994 through 2001, EPA fenced off a portion of the landfill, removed up to two feet of soil in some (but not all) areas, placed a "geotextile mat" over contaminated soils in some (but not all) areas, and covered some (but not all) contaminated soils with approximately one foot of soil. EPA also performed some grading work in an attempt to direct contaminated runoff away from residential areas.

34. EPA did not replace soil or install a geotextile mat on at least nine residential properties at Gordon Plaza where residents did not voluntarily allow access. EPA had and has a right of access under 42 U.S.C. § 9604.

35. EPA did not replace soil under roads, sidewalks or buildings.

36. EPA did not perform or require a groundwater cleanup.

37. On April 4, 2002, EPA announced it would require "no further remedial action" at the Agriculture Street Landfill site.

38. In 2005, Hurricane Katrina further devastated the Agriculture Street Landfill, forcing residents to leave their homes to escape the flooding.

39. Flooding and time have eroded the inconsistent soil cover that EPA installed to limit residents' exposure to landfill waste.

40. EPA's geotextile mat that indicates the border between EPA's fill and landfill toxics is now exposed in places and missing in others.

41. Contaminated soil has washed out from under homes and thus contaminated the surrounding area.

42. Subsidence and washout of soils beneath residential homes pose an ongoing risk of structural failure and new pathways of exposure to contaminated soil.

43. The Plaintiff's members are living, and have been living for years, amid crumbling garbage-filled buildings while facing the risks of toxic chemical exposures.

*Chemicals and Health Effects*

44. The Agriculture Street Landfill is contaminated with arsenic, lead, and polynuclear aromatic hydrocarbons ("PAHs") among more than 140 toxic materials, at least 49 of which are associated with cancer.

45. Waste at the landfill poses the risk of public exposure to at least the following chemicals at levels in excess of safe concentrations.

| | | | |
|---|---|---|---|
| Arsenic | Thallium | Dibenzo(a,h)anthracene | 4, 4' DDD |
| Beryllium | Benzo(a)anthracene | Indeno(1,2,3-cd)pyrene | Dioxins |
| Chromium | Benzo(a)prene | Arochlor 1248 | Furan |
| Cobalt | Benzo(b)fluoranthene | Arochlor 1254 | |
| Copper | Benzo(k)fluoranthene | Arochlor 1260 | |
| Lead | | | |

46. There is no safe level of lead exposure with respect to developmental impacts on children. In addition, lead can damage every organ system, and the nervous system is especially sensitive to lead exposure.

47. Arsenic is a known carcinogen and can harm health through ingestion, skin contact, and inhalation.

48. Exposure to polynuclear aromatic hydrocarbons can cause various types of cancer including lung, skin, and bladder cancers.

49. Beryllium exposure can cause scarring lung disorders where oxygen cannot move freely from lungs to the blood supply, lung cancer, pneumonia, chest pain, dermatitis, and other breathing difficulties.

50. Chromium compounds are human carcinogens. Exposure to chromium can occur through inhalation and ingestion. Breathing chromium can cause asthma and stomach irritation including ulcers.

51. In addition to carcinogens, the chemicals present at the Site contain teratogens and mutagens. Teratogens can cause birth defects. Mutagens can cause genetic damage.

52. Dioxin exposure can cause skin lesions, liver damage, immune and nervous system damage, and disruptions in the reproductive system. Furans are in a similar class of chlorinated aromatic organic compounds as dioxins.

53. Chemicals in the Agriculture Street Landfill comprise a toxic stew, with synergistic and cumulative impacts on the health and welfare of residents.

*Legal Background*

54. RCRA's "imminent hazard" provision, 42 U.S.C. § 6972(a)(1)(B), confers upon courts "the authority to eliminate any risks posed by toxic wastes." *Interfaith Community Organization v. Honeywell Intern., Inc.*, 399 F.3d 248, 260 (3d Cir. 2005) (internal quotation marks and citations omitted). To prevail in a RCRA "imminent hazard" case:

> [P]laintiffs need only demonstrate that the waste ... "may present" an imminent and substantial threat.... Similarly, the term "endangerment" means a threatened or potential harm, and does not require proof of actual harm.... The endangerment must also be "imminent" [meaning] threatens to occur immediately.... Because the operative word is "may," however, the plaintiffs must [only] show that there is a potential for an imminent threat of serious harm ... [as] an endangerment is substantial if it is "serious" ... to the environment or health.

399 F.3d at 258 (quoting *Parker v. Scrap Metal Processors, Inc.*, 386 F.3d 993, 1015 (11th Cir.2004), and citing *Cox v. City of Dallas*, 256 F.3d 281, 300–01 (5th Cir.2001)).

CAUSE OF ACTION

55. The Resource Conservation and Recovery Act provides that any person may bring suit "against any person … including any… past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B).

56. Liability under 42 U.S.C. § 6972(a)(1)(B) is strict, joint, and several.

57. The Defendants are present and past operators of a disposal facility and have contributed to the handling and disposal of solid and hazardous waste that may present an imminent and substantial endangerment to health or the environment.

58. The Defendants have handled and disposed of solid and hazardous waste that may present an imminent and substantial endangerment to health and the environment because, as a result of the Defendants' handling and disposal of waste at the Agriculture Street Landfill, the Plaintiff's members face the risk that exposure to toxic chemicals has harmed and will harm their health and the health of their loved ones, family members, and neighbors.

59. The Defendants have handled and disposed of solid and hazardous waste that may present an imminent and substantial endangerment to health and the environment because, as a result of the Defendants' handling and disposal of waste at the Agriculture Street Landfill, the Plaintiff's members' and other landfill residents' reasonable concerns about exposure to toxic chemicals causes them stress that puts their health at risk.

60. The Defendants have handled and disposed of solid and hazardous waste that may present an imminent and substantial endangerment to health and the environment because, as a result of the Defendants' handling and disposal of waste at the Agriculture Street Landfill, the Agriculture Street Landfill has become and has remained blighted with myriad abandoned and damaged buildings that attract vermin and criminals, endangering the health and welfare of the Plaintiff's members and other residents of the landfill. The blight in the community is due to the toxic nature of the landfill, which prevents rebuilding of housing or replacement of the Morton School. As a result, residents have been living for years in the midst of crumbling garbage-filled buildings and the criminal activity they invite while facing the risks of toxic chemical exposures.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully request that this Court:

A. Declare that Defendants are in violation of the Resource Conservation and Recovery Act;

B. Order the Defendants to relocate the Plaintiff's members into comparable housing consistent with the provisions of the Uniform Relocation Assistance and Real Property Acquisition Policies Act, 42 U.S.C. § 4601 et. seq. and 49 C.F.R. pt. 24 as amended;

C. Grant other relief such as this Court deems proper; and

D. Grant an award of litigation costs, including reasonable attorney fees and expert witness fees, pursuant to 42 U.S.C. § 6972(e).

Respectfully submitted on April 25, 2018,

TULANE ENVIRONMENTAL LAW CLINIC

/s/ Lisa W. Jordan
Lisa W. Jordan (La. Bar No. 20451)
Director, Tulane Environmental Law Clinic
6329 Freret Street
New Orleans, LA 70118-6348
Phone: (504) 314-2481
Fax: (504) 862-8721
lwjordan@tulane.edu
*Counsel for Plaintiff Residents of Gordon Plaza, Inc. and Supervising Attorney for participating Tulane Environmental Law Clinic Student Attorneys*

/s/ Ryan Sundstrom
Ryan Sundstrom, Student Attorney
Tulane Environmental Law Clinic
6329 Freret Street
New Orleans, LA 70118-6348
Phone: (504) 865-5789
Fax: (504) 862-8721
*Counsel for Plaintiff Residents of Gordon Plaza, Inc.*

/s/ Adam Babich
Adam Babich (La. Bar No. 27177)
6329 Freret Street, Ste. 259F
New Orleans, Louisiana 70118
Phone: (504) 862-8800
ababich@tulane.edu
*Counsel for Plaintiff Residents of Gordon Plaza, Inc.*

**SUPERVISING ATTORNEY'S INTRODUCTION**
**OF STUDENT PRACTICTIONER**

Undersigned counsel respectfully introduces law student practitioner Ryan Sundstrom to this Court pursuant to Local Rule 83.2.13. This student practitioner is duly enrolled in Tulane Law School and the Tulane Environmental Law Clinic. He meets all of the prerequisites for a Law Student Appearance under Local Rule 83.2.13(A) and has taken the oath prescribed by that section. His client's written consent to student appearances is attached as Exhibit 2 to this Complaint pursuant to Local Rule 83.2.13. The Tulane Law School Dean's Certification that the student practitioner is of good moral character, competent legal ability, and adequately trained to perform as a legal intern is attached as Exhibit 3 to this Complaint pursuant to Local Rule 83.2.13(B).

Respectfully submitted on April 25, 2018

TULANE ENVIRONMENTAL LAW CLINIC

/s/ Lisa Jordan
Lisa W. Jordan, Professor of the Practice, Tulane Law School

.

EXHIBIT
1
exhibitsticker.com

Tulane University

Tulane Environmental Law Clinic

September 27, 2017

*Via Registered Mail (Return Receipt Requested)*
Mayor Mitch Landrieu c/o
Ms. Rebecca H. Dietz, City Attorney
City of New Orleans, LA
1300 Perdido St.
New Orleans, LA 70112

Re: Agriculture Street Landfill – Request for Relocation from the Residents of Gordon Plaza, Inc., and Notice of Endangerment under the Resource Conservation and Recovery Act, 42 U.S.C. § 6972

Dear Mayor Landrieu:

To begin: Thank you for your leadership and courage in removing symbols of racism from our city. We appreciate that historic accomplishment. You reminded us that it is time to stop finding "excuses for not doing the right thing" and that this City must face its flaws and correct them.[1]

On behalf of the Residents of Gordon Plaza, Inc., we are writing today about another of racism's legacies: the abandonment of African-American New Orleanians in a blighted community located on a toxic landfill. Since the 1990s, the Agriculture Street Landfill has been a national symbol of environmental racism.[2] The problem, however, is not merely symbolic. Each and every day, residents on the landfill face the physical and health risks of living in a blighted community that is contaminated with toxic chemicals. We now ask that the City offer to relocate the residents of the Agriculture Street Landfill, using the Uniform Relocation Assistance and Real Property Acquisition Policies Act as a starting point.[3]

---

[1] Remarks delivered by Mayor of New Orleans Mitch Landrieu, reprinted in N.Y. TIMES (May 23, 2017).

[2] J. TIMMONS ROBERTS AND MELISSA M. TOFFOLON-WEISS, CHRONICLES FROM THE ENVIRONMENTAL JUSTICE FRONTLINE (Cambridge University Press 2001) 165. *See also* Richard A. Webster, *The poisoned promises of Agriculture Street*, Nola.com, April 22, 2015, http://www.nola.com/politics/index.ssf/2015/04/agriculture_street_landfill_ne.html.

[3] 42 U.S.C. § 4601 et seq. and 49 C.F.R. pt. 24. In fairness to the community, the phrase "the project for which the property is to be acquired" in 49 C.F.R. § 24.103(b) must be deemed to include, without limitation, the environmental, stigma, and social effects of the City's decision to develop residential housing on a toxic waste dump. *See, e.g.*, Consent Decree ¶ 13, *LEAN v. City of Baton Rouge*, 10-cv-00187-BAJ-SCR, ECF No. 47 (Mar. 19, 2013).

The City of New Orleans created this problem. And for decades now, the City has found excuses for not doing the right thing. The City even refused to pay a 2006 Civil District Court judgment, as modified by Louisiana's Fourth Circuit Court of Appeal. Since that judgment, the situation at the landfill has gotten worse. The blight in the community has increased, primarily because the toxic nature of the landfill prevents rebuilding of housing or replacement of the Morton School. Those buildings sit blighted, posing a danger to residents.

Flooding and time have eroded the inconsistent soil cover that EPA installed to limit residents' exposure to landfill waste. EPA's "geotextile mat" that indicates the border between EPA's fill and landfill toxics is now exposed in places and missing in others. Contaminated soil has washed out from under homes and thus contaminated the surrounding area. Subsidence and wash-out of soils beneath residential homes pose an ongoing risk of structural failure and new pathways of exposure to contaminated soil. As a result, residents have been living for years in the midst of crumbling garbage-filled buildings while facing the risks of toxic chemical exposures. We need your help, and we need the City of New Orleans to step up to its legal and moral duty to correct this environmental and racial injustice.

In 1998, the Gambit Weekly praised then-U.S. Senator Mary Landrieu's work "to find a way to relocate the residents" and noted that relocation would be "a small price to pay to bring peace of mind and improved health to a group of homeowners whose piece of the American Dream has been a prolonged nightmare."[4] That report began, "If one thing is clear in the Agriculture Street imbroglio, it is that the residents of Gordon Plaza did not have a hand in creating the mess that literally surrounds them. Rather this monster was birthed by the city of New Orleans and the U.S. Department of Housing and Urban Development."[5] Relocation costs would also be a small price to pay to remove from the City the landfill's notorious stain of ongoing racial and environmental injustice.

The Residents of Gordon Plaza, Inc. comprises people who are currently trapped in a blighted community on a toxic dump because of the City of New Orleans' decisions and activities. These City of New Orleans decisions and activities have had a disproportionate impact on African-American residents. We are not aware of any non-minority community that has been treated in such a manner. We are asking you to correct this longstanding and continuing wrong.

*The Unlawful Endangerment*

The City of New Orleans has contributed and is contributing to the handling and disposal of solid and hazardous waste at the Agriculture Landfill that "may present an imminent and substantial endangerment to health or the environment" within the meaning of 42 U.S.C. § 6972(a)(1)(B). The City's disposal and handling of solid and hazardous waste have contributed to this endangerment in three primary ways:

---

[4] *Clean Up This Mess*, Gambit Weekly, Nov. 17, 1998, at 7.
[5] *Id.*

*1)* the City's waste disposal and handling have led to reasonable concerns about toxic exposures that have caused the neighborhood located on the Agriculture Landfill to become blighted with myriad abandoned and damaged buildings that attract vermin and criminals, endangering the health and welfare of Gordon Plaza residents;

*2)* the City's waste disposal and handling have created the risk of exposure and potential exposure to toxic chemicals and waste, endangering the health and welfare of Gordon Plaza residents by creating physical and emotional stress and injury, and

*3)* the City has allowed flooding, erosion, and time to degrade the already inadequate protections that EPA provided, *i.e.*, an inconsistent layer of top soil on top of a geotextile mat, further endangering Agriculture Street residents.

The Agriculture Street Landfill is contaminated with arsenic, lead, and polycyclic aromatic hydrocarbons ("PAHs") among more than 140 toxic materials, at least 49 of which are associated with cancer. Waste at the landfill poses the risk of public exposure to at least the following chemicals in excess of safe concentrations.

Arsenic
Beryllium
Chromium
Cobalt
Copper
Lead
Thallium
Benzo(a)anthracene
Benzo(a)prene
Benzo(b)fluoranthene
Benzo(k)fluoranthene,
Dibenzo(a,h)anthracene
Indeno(1,2,3-cd)pyrene
Arochlor 1248
Arochlor 1254
Arochlor 1260
4, 4' DDD
Dioxins
Furan

EPA and Louisiana Department of Environmental Quality screening levels and risk analyses do not account for the synergistic and cumulative impacts of the "stew" of various chemicals present at the Agriculture Street Site. Accordingly, governmental chemical-by-chemical assessments understate the risks of living on this toxic dump.

Sampling that Chemist Wilma Subra performed on the Agriculture Street Site soils after Hurricane Katrina identified contaminants in excess of Louisiana Department of Environmental Quality's Risk Evaluation/Corrective Action Program (RECAP) standards, including without limitation Arsenic (13 mg/kg), Benzo(a)anthracene (900 ug/kg), Benzo(a)pyrene (1200 ug/kg), Benzo(b)fluoranthene (1200 ug/kg), and Indeno(,2,3-cd)pyrene (720 ug/kg). The above lists of chemicals include known and suspected carcinogens, teratogens, and mutagens. The Subra Report, dated October 12, 2015, is attached as Exhibit A to this request and notice and incorporated by reference.

Environmental sampling does not tell the whole story. The photographs below—showing dangerous blight caused by the City of New Orleans' disposal and handling of solid and hazardous waste at the site—illustrate another aspect of the endangerment. The abandoned buildings contain rodents and people's discarded personal belongings from before Hurricane Katrina. Criminals use this blighted landscape to burn cars, dump trash, test guns, scribble

graffiti, and slip in abandoned buildings. Larger copies of these photographs and others are attached as Exhibit B to this request and notice and incorporated by reference.

| | | |
|---|---|---|
|  |  |  |
| 4/29/16 Abandoned and blighted homes | 4/29/16 Abandoned and blighted homes | 4/29/16 View from Benefit & Gordon Plaza |
|  |  |  |
| 4/29/16 Abandoned and blighted house with Katrina-era household waste | 4/29/16 Abandoned and blighted school building | 5/10/16 Exposed geotextile mat (indicating the interface between fill and contaminated soil) |

*Background*

Louisiana's Fourth Circuit Court of Appeal summarized the landfill's history: "From the early 1900's until approximately 1958, the City of New Orleans (City) leased more than one hundred acres of land in the City's ninth ward for the operation of a municipal landfill and garbage dump. The site, known as the Agriculture Street Landfill (ASL), was bordered by Almonaster Boulevard on the west, Higgins Boulevard on the north, Louisa Street on the east, and the Peoples Avenue Canal and railroad tracks on the south. In 1965, the City reopened the ASL site for the disposal of massive quantities of debris created by Hurricane Betsy."[6]

The Civil District Court noted that after Hurricane Betsy, "Up to three hundred truckloads per day of trash material was burned [at the landfill] for nine months. No specific closure plan was followed."[7]

In 1967, the City entered into a cooperative agreement for the development of residential properties on the landfill, resulting first in construction of Press Park town homes and apartments

---

[6] *See* Johnson v. Orleans Par. Sch. Bd., 2006-1223 (La. App. 4 Cir. 1/30/08), 975 So. 2d 698, 703.

[7] *See* Reasons for Judgment ¶ 3, Johnson v. Orleans Par. Sch. Bd., No. 93–14333, Division J–13 (Jan. 12, 2006).

between 1969 and 1971. "No remediation or special site preparation was done before Press Park was constructed."[8] In 1980, the sixty-seven family homes comprising Gordon Plaza were built.[9] The City performed soil testing in the Gordon Plaza area before construction but has never produced the resulting report.[10]

The City "billed the Gordon Plaza community and its respectable homes as a way for low- to middle-income African Americans to have a piece of the American Dream."[11] Gordon Plaza homebuyers "were not told that their homes were located on what had once been a part of the City's landfill."[12] The then-Mayor of New Orleans reportedly "worked closely on the project with a group of his friends and financial contributors, all of whom benefited financially from the deal."[13] In 1983, EPA testing revealed "that the soil was contaminated with more than one hundred forty toxic and hazardous materials, more than forty of which are known to cause cancer in humans."[14]

EPA listed the Agriculture Landfill as a "Superfund Site" in 1994.[15] From 1994 to 1997, EPA took various steps intended to reduce exposures. These consisted of some grading work to direct stormwater away from residences, replacing the top two feet (or less) of soil in some (but not all) contaminated areas, fencing off the large undeveloped portion of the landfill, and laying a geotextile mat over some (but not all) contaminated areas under dirt or sod. EPA provided residents with "a list of permanent restrictions on the use of their property and advised [them] that they were responsible for maintaining the integrity of the clean layer of topsoil and the felt-like material that comprises the semi-permeable barrier ...."[16] EPA also required the City to provide utilities with a "Technical Abstract" requesting that utility workers implement a protocol "to maintain the integrity of the permeable soil and geotextile mat," including determining the need for "personal protective equipment."[17] Such an attempt to delegate the job of maintaining a Superfund site to non-expert homeowners and utility workers (who did not cause the contamination) is an unreliable approach to limiting toxic exposures—especially when owner occupancy is interrupted by a storm such as Katrina.

---

[8] *See* 975 So. 2d at 703.

[9] *Id.*

[10] *See* Reasons for Judgment ¶ 18, Johnson v. Orleans Par. Sch. Bd., *supra*, (Jan. 12, 2006).

[11] J. TIMMONS ROBERTS AND MELISSA M. TOFFOLON-WEISS, CHRONICLES FROM THE ENVIRONMENTAL JUSTICE FRONTLINE (Cambridge University Press 2001) 171. See also Christi Daugherty, *Digging In*, GAMBIT WEEKLY, Nov. 3, 1998 ("A colorful brochure produced by [the then-Mayor's] administration in 1979 promised that 'new neighborhoods like Gordon Plaza will revitalize the Desire area.").

[12] 975 So. 2d at 703.

[13] *Clean Up This Mess*, Gambit Weekly, Nov. 17, 1998, at 7.

[14] 975 So. 2d at 704.

[15] 59 Fed. Reg. 65206 (Dec. 16, 1994).

[16] 975 So. 2d at 705.

[17] Appendix "A" to Consent Decree, U.S. v. City of New Orleans, 02-cv-3618, ECF No. 257-1 (E.D. La. May 29, 2008).

In 2002, EPA decided to take "No Further Action." In 2005, Hurricane Katrina flooded and further devastated the Agriculture Street community. Homeowners with "damaged residences located in the Superfund site in the Agriculture Street contour" were made ineligible for some Road Home benefits (*i.e.*, they were denied two out of the three options offered to most other New Orleans residents).[18] Community members are now essentially trapped in a blighted and contaminated neighborhood due to the City of New Orleans' handling and disposal of solid and hazardous waste.

*Conclusion*

This letter is a request for help and we hope and expect to proceed cooperatively with the City to resolve these issues. The letter also serves as a "notice of endangerment" under the Resource Conservation and Recovery Act, 42 U.S.C. § 6972(b)(2). Under that Act, "any person" who contributes or contributed to disposal or handling of waste that may endanger the public is responsible for taking such "action as may be necessary" to abate the endangerment.[19] Providing this notice therefore preserves the legal rights of the Residents of Gordon Plaza, Inc. in what we hope is the unlikely event that a cooperative solution cannot be achieved. If you have any questions about this notice or find any of it confusing or inaccurate, please contact one of the attorneys listed below.

Thank you for considering our request. Please respond to one of the attorneys listed below as soon as practical.

---

[18] *See* The Road Home Homeowner Program Policies, https://www.road2la.org/HAP/Docs/Compliance/Official%20V.10%20Homeowner%20Program%20Policies_%202016_03_31.pdf.

[19] This RCRA provision "contains no statute of limitations." Meghrig v. KFC W., Inc., 516 U.S. 479, 486 (1996).

Respectfully submitted on September 27, 2017,

**RESIDENTS OF GORDON PLAZA, INC.**

By: ______________________
Adam Babich, Bar No. 27277
6329 Freret Street
New Orleans, LA 70118
Direct Line: 504.862.8800
*Counsel for Residents of Gordon Plaza, Inc.*

By: ______________________
Lisa W. Jordan, La. Bar No. 20451
Tulane Environmental Law Clinic
6329 Freret Street
New Orleans, LA 70118
Direct Line: 504.314.2481
*Counsel for Residents of Gordon Plaza, Inc.*

Researched and edited by:

______________________
Allison N. Skopec, Student Attorney
Tulane Environmental Law Clinic
6329 Freret Street
New Orleans, LA 70118

cc:

*Certified Mail: 70130600000198922778*
Mr. E. Scott Pruitt, Administrator
U.S. EPA
Office of the Administrator, 1101A
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

*Certified Mail: 70130600000198922785*
Mr. Jefferson Beauregard Sessions, III
U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

*Certified Mail: 70130600000198922792*
Mr. Samuel Coleman, P.E.
Regional Administrator
U.S. EPA, Region 6
Fountain Place 12th Floor, Suite 1200
1445 Ross Avenue
Dallas, TX 75202-2733

*Certified Mail: 70130600000198922808*
Dr. Chuck Carr Brown, Secretary
Louisiana Department of Environmental Quality
P.O. Box 4301
Baton Rouge, LA 70821-430

*Certified Mail: 70130600000198922815*
Governor John Bel Edwards
Office of the Governor
P.O. Box 94004
Baton Rouge, LA 70804

# Exhibit A

## Subra Report (October 12, 2015)

SUBRA COMPANY

3814 Old Jeanerette Road, New Iberia, LA 70563 • P.O. Box 9813, New Iberia, LA 70562-9813
Phone 337.367.2216 • Fax 337.367.2217 • E-mail subracom@aol.com

To: Aruro J. Blanco

Director 6 RA-DA

Office of Environmental Justice and Tribal Affairs

US EPA Region 6

1445 Ross Avenue

Dallas, Texas 75202-2733

From: Wilma Subra (WS)

Subject: Agriculture Street Landfill Super Fund Site

Date: October 12, 2015

RECEIVED 15 OCT 19 PM

In response to your dealings with Sharon Rainey Blanco concerning the Agriculture Street Landfill Superfund Site in New Orleans, I was requested to provide you with data I obtained after Hurricane Katrina from the Ag Street site.

Attached are copies of data resulting from:

-Samples collected on September 16, 2005 near the corner of Almonaster Boulevard and Liberty Terrace Drive (samples SS-2 soil and SW-2 water).

-Soil samples collected on October 1, 2005, on St. Ferdenand St. (SS-12) and Abundance St. (SS-11).

-Soil and soil/sediment mixture collected on February 16, 2006 on the north end of Ag Street landfill off Higgins Blvd.., and along Benefit, Gordon Plaza and Press streets.

A write up of the Agriculture Street Landfill Contamination Areas is presented on the last 4 pages and contains information on a meeting with Sam Coleman on April 19, 2006.

If additional information is needed, please contact me.

ALTAMONT ENVIRONMENTAL, INC.
ENGINEERING & HYDROGEOLOGY
50 COLLEGE STREET, ASHEVILLE, NC 28801
TEL. 828.281.3350 FAC. 828.281.3351
www.altamontenvironmental.com

***Transmitted by E-mail***
***subracom@aol.com***

October 6, 2005

Ms. Wilma Subra
Subra Company
P.O. Box 9813
New Iberia, LA 70562

Subject: Sediment and Surface Water Sampling and Analyses
Five Louisiana Locations

Dear Ms. Subra:

On September 16, 2005, Altamont Environmental, Inc. (Altamont) assisted Subra Company with sediment and surface water sampling at five locations in south Louisiana. The sampling was conducted as part of an effort to assess potential contamination that may have resulted in residential areas due to the affects of Hurricane Katrina.

In summary: using a small population of samples, this study has shown that several contaminants exist in the residential areas that were sampled. However, two facts remain unknown: the physical extent of these contaminants, and the range of existing concentrations. These determinations can only be made on the basis of additional sampling and characterization of these areas.

This letter contains a description of the background, findings, and conclusions of the sampling and the associated sample analyses.

## BACKGROUND

Following Hurricane Katrina, Subra Company requested assistance from Altamont with collection and analyses of sediment and surface water samples at the following general locations:

- Bywater neighborhood in New Orleans
- Near the Industrial Canal in New Orleans
- Chalmette and Meraux

Flooding associated with Hurricane Katrina deposited a layer of sediment in many areas of southeast Louisiana, including these three general areas. The purpose of this project was to screen sediments in residential areas for a wide range of organic and inorganic compounds. Samples were to be similarly collected and analyzed where standing surface water was observed. The samples were analyzed for compounds that might reasonably be expected to occur in these areas, given nearby land uses.

As shown in the following text and tables, the analytical results have been compared to Louisiana Department of Environmental Quality (LDEQ) and US Environmental Protection Agency (US EPA) criteria.

# METHODS AND OBSERVATIONS

## SAMPLE LOCATION SELECTION

A total of five sample locations were selected in the three previously described general areas. The locations of these samples with respect to the New Orleans area are shown in Figure 1. Each location was chosen on the following bases:

**Bywater (SS-1)**
The Bywater neighborhood was selected because of the extensive flooding that occurred in a densely populated residential area. During a drive through of the area, a thin layer of residual sediment was observed in most locations southeast of Interstate-10 along North Claiborne Avenue and North Robertson Streets, west of Franklin Avenue. The actual sampling location was in the median at the intersection of North Claiborne and St. Roch Avenues. Figure 2 shows the approximate location of SS-1.

**East New Orleans (SS-2 and SW-2; SS-3)**
The area in east New Orleans near the Industrial Canal was selected due to extensive flooding that occurred there and the proximity of an EPA Superfund site (Agriculture Street Landfill) to a residential neighborhood.

A sediment layer of variable thickness was also observed in most locations during a drive through of the area. Two sample locations were selected: one (SS-2 and SW-2) near the corner of Almonaster Boulevard and Liberty Terrace Drive, and one (SS-3) along Morrison Avenue near Foch Road. Respectively, these sites were south and north of Interstate 10.

Sample SS-2 was collected from a grassy median, and SW-2 was collected from standing water near the middle of the northbound portion of Almonaster. Both locations were approximately 60 feet south of the northern intersection of Liberty Terrace with Almonaster.

Sample SS-3 was collected from the intersection of Morrison Avenue and the entry drive to "Georgetown of New Orleans;" an apartment complex north of Morrison Avenue.

Samples SS-2 and SW-2 are shown in Figure 3. Sample SS-3 is shown in Figure 4.

**Meraux (SS-4)**
The Meraux area was selected for sampling due to extensive flooding and the proximity of the Murphy Oil Company refinery to residential areas. Altamont attempted to enter streets west and east of the refinery. Several streets on both of these sides of the refinery were blocked by police barricades. Judy Drive was the first open street east of the refinery. In an attempt to sample near the tank farm portion of the refinery, Altamont selected a location on the west side of Judy Drive, near its intersection with East

Judge Pérez Drive. The sample was collected from the west side of Judy Drive, approximately 100 feet south of East Judge Pérez Drive, in a location where sediment had been cleared from the street. Sediment thickness near SS-4 ranged from approximately one to four inches. Figure 5 shows the approximate location of SS-4.

**Chalmette (SS-5)**
The Chalmette area was selected for sampling due to extensive flooding and the proximity of the Exxon/Mobil Oil refinery to residential areas. Altamont collected the sample from the east side of Lloyds Avenue in an area where dried sediment had accumulated. This location was some 850 feet north of West St. Bernard Highway, which is adjacent to the northern boundary of the refinery. Figure 6 shows the approximate location of SS-5.

## SAMPLE COLLECTION

Altamont restricted sediment sampling to the apparent layer of recently deposited material. All sediment samples were collected from undisturbed areas in public rights-of-way. The sole surface water sample was collected from water standing in the street.

In each case, except that encountered at the Almonaster Avenue location, the sediment layer was visibly distinct from the native soil. Sediment observed at Almonaster was saturated and, based on the wet appearance of grass and portions of the adjacent street, flood waters appeared to have receded within hours of the time that the sample was collected. As a result, the relatively thin sediment layer, approximately 1/8-inch, was indistinct from the native soil.

Conditions at the five sample locations were noted with the following observations:

- SS-1: Light gray, fine grained, dry sediment; approximately 1/8-inch thick
- SS-2: Dark brown, fine grained, saturated sediment; approximately 1/8-inch thick
- SW-2: Standing water
- SS-3: Medium gray and grayish-tan (two distinct colors), fine grained, dry sediment; approximately 1/4-inch thick
- SS-4: Dark brown, fine grained, nearly saturated sediment; approximately 1 to 2 inches thick
- SS-5: Medium brown-brown, fine grained, dry sediment; approximately 1/2-inch thick

All samples were collected using stainless steel scoops and/or new vinyl gloves. The collected quantities of soil and water were placed in new sample containers provided by Pace Analytical Services (Pace). The sample containers were then placed in coolers and covered with ice. Altamont maintained control of the cooler throughout the sampling period until delivery of the cooler containing all five samples plus a trip blank, to the Pace laboratory in St. Rose, Louisiana at approximately 5:30 pm on the day of sampling.




©2005 GOOGLE - MAP DATA ©2005 NAVTEQ™ -IMAGERY ©2005 DIGITAL GLOBE

ALTAMONT ENVIRONMENTAL, INC.
ENGINEERING & HYDROGEOLOGY
50 COLLEGE STREET, ASHEVILLE, NC 28801
TEL 828.281.3350 FAC 828.281.3351
www.altamontenvironmental.com

DRAWN BY: PAUL DOW
PROJECT MANAGER: JIM MCELDUFF
CLIENT: SUBRA COMPANY
DATE: 10/06/05

SCALE (FEET)
250 0 250 500

# APPROXIMATE SAMPLE LOCATIONS SS-2 & SW-2

LOUISIANA SAMPLING
NEAR ALMONASTER BLVD. &
LIBERTY TERRACE DR.
NEW ORLEANS, LA 70126

FIGURE
3

FILE PATH: P:\SUBRA\LOUISIANA\FIGURES\ SS-2 SW-2.DWG

# Table 1
## Volatile Organic Compounds and Total Petroleum Hydrocarbons Analytical Results

### Subra Company
### Louisiana Sampling

### September 16, 2005

| Sample | Collection Date | Matrix | Volatile Organic Compounds (VOCs) | | | | | | | | | TPH - DRO | TPH - GRO |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Acetone | Benzene | 2-Butanone (MEK) | Carbon Disulfide | Chlorobenzene | 1,2-Dichloroethane | Methylene Chloride | Toluene | Xylenes (Total) | | |
| | mm/dd/yy | | µg/kg | µg/kg | µg/kg | µg/kg | µg/kg | µg/kg | µg/kg | µg/kg | µg/kg | µg/kg | µg/kg |
| SS-1 | 09/16/05 | Soil | 59.0 N A99 | 1.80 J | 7.91 J A99 | 1.29 J A99 | 0.764 J | 0.706 J | 64.8 N | 2.72 J | 0.235 J | NA | NA |
| SS-2 | 09/16/05 | Soil | 143 N A99 | 1.73 J | 15.1 A99 | 2.43 J A99 | 0.618 J | <4.35 | 5.60 N | 2.01 J | 0.940 J | NA | NA |
| SS-3 | 09/16/05 | Soil | NA | NA | NA | NA | NA | NA | NA | NA | NA | **810,000** | <2,500 |
| SS-4 | 09/16/05 | Soil | 53.4 N A99 | 0.710 J | 13.8 A99 | 14.9 A99 | 0.817 J | <6.70 | 10.4 N | 2.51 J | <6.70 | NA | NA |
| SS-5 | 09/16/05 | Soil | 58.3 N A99 | <6.50 | 9.37 J A99 | 6.93 A99 | 0.819 J | <6.50 | 9.93 N | 1.30 J | <6.50 | NA | NA |
| LDEQ Soil Standards | | | 160,000 | 820 | 580,000 | 37,000 | 17,000 | 800 | 18,000 | 69,000 | 150,000 | 61,000 | 61,000 |
| EPA Region VI Soil Screening Levels | | | 70,000,000 | 660 | 32,000,000 | 720,000 | 320,000 | 350 | 8,900 | 520,000 | 210,000 | NE | NE |

| Sample | Collection Date | Matrix | Volatile Organic Compounds (VOCs) | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | Benzene | 2-Butanone (MEK) | Carbon Disulfide | Ethylbenzene | 2-Hexanone | Toluene | Xylenes (Total) |
| | mm/dd/yy | | µg/L | µg/L | µg/L | µg/L | µg/L | µg/L | µg/L |
| SW-2 | 09/16/05 | Surface Water | 1.82 | 10.1 | 2.85 | 0.320 J | 0.490 J | 2.16 | 1.45 J |
| Louisiana Surface Water Criteria | | | 12.5 | NE | NE | 8100 | NE | 46200 | NE |

**Notes:**

1) This table represents detected compounds only.
2) For complete analyses and detection limits see the individual laboratory analytical reports.
3) Volatile Organic Compound analyses by USEPA Method 8260.
4) Bold numbers indicate concentrations above applicable Standards.
5) µg/L - micrograms per liter.
6) µg/kg - micrograms per kilogram.
7)TPH denotes Total Petroleum Hydrocarbons; DRO denotes Diesel Range Organics; GRO denotes Gasoline Range Organics.
8) NE - Constituent Not Established in applicable standards.
9) A99 - Analyte poor performer for this method. The QC recovery data may be poor or erratic.
10) J - This estimated value for the analyte is below the adjusted reporting limit but above the instrument reporting limit.
11) LDEQ Soil Standards : LDEQ Recap Table 1 Screening Option Screening Standards for Soil and Groundwater; updated 9/19/2000.
12) EPA Region VI Soil Screening Levels : Region 6 Human Health Medium-Specific Screening Levels 2004-2005; updated 12/21/2004.
13) Louisiana Surface Water Criteria : Title 33, Environmental Quality, Part IX. Water Quality, Subpart 1. Water Pollution Control; Table 1 Numerical Criteria for Specific Toxic Substances; updated 7/05.
14) N - Methylene chloride and acetone are common solvents used extensively in most laboratories. Due to facility damage caused by Hurricane Katrina, these compounds may be present at elevated concentrations in the air.
Results for these analytes may be affected by random spikes in the laboratory atmosphere during analysis of both samples and calibration standards, resulting in a greater margin of error.
The reporting limits for methylene chloride and acetone have been raised accordingly. The laboratory is scheduling all facility repairs as soon as possible
15) NA - Constituent Not Analyzed for that sample.

# Table 2
## Semivolatile Organic Compounds Analytical Results

### Subra Company
### Louisiana Sampling

### September 16, 2005

| Sample | Collection Date | Matrix | Semivolatile Organic Compounds (SVOCs) | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Acenaphthylene | Anthracene | Benzo(a)anthracene | Benzo(b)fluoranthene | Benzo(g,h,i)perylene | Benzo(a)pyrene | Carbazole | Chrysene | bis(2-Ethylhexyl)phthalate | Fluoranthene | Indeno(1,2,3-cd)pyrene | Phenanthrene | Pyrene |
| | *mm/dd/yy* | | *µg/kg* | *µg/kg* | *µg/kg* | *µg/kg* | *µg/kg* | *µg/kg* | *µg/kg* | *µg/kg* | *µg/kg* | *µg/kg* | *µg/kg* | *µg/kg* | *µg/kg* |
| SS-1 | 09/16/05 | Soil | 110 J | 75.3 J | 196 J | 343 | 78.9 J | **195 J** | 47.3 J | 254 J | 885 | 685 | 65.9 J | 201 J | 361 |
| SS-2 | 09/16/05 | Soil | <330 | 69.9 J | 179 J | 320 J | <330 | **167 J** | 56.3 J | 226 J | 304 J | 654 | 63.9 J | 211 J | 197 J |
| SS-4 | 09/16/05 | Soil | <330 | <330 | <330 | <330 | <330 | <330 | <330 | <330 | <330 | <330 | <330 | <330 | <330 |
| SS-5 | 09/16/05 | Soil | <330 | <330 | <330 | <330 | <330 | <330 | <330 | <330 | <330 | <330 | <330 | <330 | <330 |
| **LDEQ Soil Standards** | | | NE | 1,400,000 | 560 | 560 | NE | 330 | NE | 61,000 | 32,000 | 200,000 | 560 | NE | 150,000 |
| **EPA Region VI Soil Screening Levels** | | | 3,700,000 | 22,000,000 | 620 | 620 | NE | 62 | 24,000 | 62,000 | 35,000 | 2,300,000 | 620 | NE | 2,300,000 |

| Sample | Collection Date | Matrix | SVOCs |
|---|---|---|---|
| | | | bis (2-Ethylhexyl) phthalate |
| | *mm/dd/yy* | | *µg/L* |
| SW-2 | 09/16/05 | Surface Water | 13.1 |
| **Louisiana Surface Water Criteria** | | | NE |

**Notes:**
1) This table represents detected compounds only.
2) For complete analyses and detection limits see the individual laboratory analytical reports.
3) Semivolatile Organic Compound analyses by USEPA Method 8270.
4) **Bold** numbers indicate concentrations above applicable Standards.
5) *µg/L* - micrograms per liter.
6) *µg/kg* - micrograms per kilogram.
7) NE - Constituent Not Established in applicable standards.
8) A99 - Analyte poor performer for this method. The QC recovery data may be poor or erratic.
9) J - This estimated value for the analyte is below the adjusted reporting limit but above the instrument reporting limit.
10) LDEQ Soil Standards : LDEQ Recap Table 1 Screening Option Screening Standards for Soil and Groundwater; updated 9/19/2000.
11) EPA Region VI Soil Screening Levels : Region 6 Human Health Medium-Specific Screening Levels 2004-2005; updated 12/21/2004.
12) Louisiana Surface Water Criteria : Title 33, Environmental Quality, Part IX. Water Quality, Subpart 1. Water Pollution Control: Table 1 Numerical Criteria for Specific Toxic Substances; updated 7/05.

# Table 3
# Metals Analytical Results

## Subra Company Sampling
## New Orleans, Louisiana

## September 16, 2005

| Sample | Collection Date mm/dd/yy | Matrix | Metals: Arsenic mg/kg | Barium mg/kg | Cadmium mg/kg | Chromium mg/kg | Lead mg/kg | Mercury mg/kg |
|---|---|---|---|---|---|---|---|---|
| SS-1 | 09/16/05 | Soil | **29.3** | 113 | 1.1 | 11.0 | 230 | 0.0799 J |
| SS-2 | 09/16/05 | Soil | **5.2** | 137 | 0.8 | 7.5 | 60 | 0.0362 J |
| SS-3 | 09/16/05 | Soil | **11.0** | 491 | 2.5 | 20.7 | 52 | 0.0815 |
| SS-4 | 09/16/05 | Soil | <3.0 | 24.1 | <0.5 | 4.4 | 6 | <0.0980 |
| SS-5 | 09/16/05 | Soil | <3.0 | 31.5 | 0.5 | 5.6 | 12 | <0.0926 |
| **LDEQ Soil Standards** | | | 0.38 | 520 | 3.7 | 22 | 400 | 2.2 |
| **EPA Region VI Soil Screening Levels** | | | 0.39 | 5,500 | 39 | 210 | 400 | NE |

| Sample | Collection Date mm/dd/yy | Matrix | Metals: Barium mg/L |
|---|---|---|---|
| SW-2 | 09/16/05 | Surface Water | 0.29 |
| **Louisiana Surface Water Criteria** | | | NE |

**Notes:**

1) This table represents detected compounds only.
2) For complete analyses and detection limits see the individual laboratory analytical reports.
3) Metals analyses by various methods.
4) **Bold** numbers indicate concentrations above applicable Standards.
5) *µg/L* - micrograms per liter.
6) *µg/kg* - micrograms per kilogram.
7) NE - Not Established in applicable standards.
8) A99 - Analyte poor performer for this method. The QC recovery data may be poor or erratic.
9) J - This estimated value for the analyte is below the adjusted reporting limit but above the instrument reporting limit.
10) LDEQ Soil Standards : LDEQ Recap Table 1 Screening Option Screening Standards for Soil and Groundwater; updated 9/19/2000.
11) EPA Region VI Soil Screening Levels : Region 6 Human Health Medium-Specific Screening Levels 2004-2005; updated 12/21/2004.
12) Louisiana Surface Water Criteria : Title 33, Environmental Quality, Part IX. Water Quality, Subpart 1. Water Pollution Control; Table 1 Numerical Criteria for Specific Toxic Substances; updated 7/05.
13) The LDEQ Soil Standard used for Chromium is that established for Hexavalent Chromium; the more toxic of the two forms of Chromium.

ALTAMONT ENVIRONMENTAL, INC.
ENGINEERING & HYDROGEOLOGY
50 COLLEGE STREET, ASHEVILLE, NC 28801
TEL.828.281.3350 FAC.828.281.3351
www.altamontenvironmental.com

# TRANSMITTAL LETTER

**To:** Wilma Subra

**From:** Kyle Westmoreland

**Date:** October 21, 2005

**cc:**

**Subject:** Draft Tables and Figures

Enclosed are Draft Tables and Draft Figures from the Gulf Coast Sampling Event. Please call us if you have any questions.

Sincerely,

Kyle Westmoreland

P:\Subra\Gulf Coast\Altamont-Transmittal- Subra 10-21-05.doc

# Table 3-A
# Metals Analytical Results

## Subra Company
## Louisiana Sampling
## October 1 and 2, 2005

| Sample | Latitude | Longitude | Collection Date mm/dd/yy | Matrix | Metals Arsenic mg/kg | Barium mg/kg | Cadmium mg/kg | Chromium mg/kg | Lead mg/kg | Selenium mg/kg | Mercury mg/kg |
|---|---|---|---|---|---|---|---|---|---|---|---|
| SS-11 | $29^0$ 59.316' North | $90^0$ 2.386' West | 10/01/05 | Soil | **11** | 280 | <0.10 | 16 | 41 | <0.50 | 0.015 |
| SS-12 | $29^0$ 59.533' North | $90^0$ 2.481' West | 10/01/05 | Soil | **13** | 220 | 1.6 | 11 | 53 | <1.0 | 0.054 |
| SS-13 | $29^0$ 38.975' North | $89^0$ 57.699' West | 10/01/05 | Soil | **6.6** | 200 | <0.097 | 9.4 | 17 | <0.48 | 0.051 |
| SS-14 | $29^0$ 43.623' North | $90^0$ 7.690' West | 10/01/05 | Soil | **8.0** | 210 | <0.35 | 11 | 35 | <1.7 | 0.025 |
| SS-15 | $30^0$ 52.175' North | $89^0$ 68.826' West | 10/02/05 | Soil | **1.2** | 70 | 0.51 | 2.9 | 30 | 1.0 | 0.088 |
| **LDEQ RECAP Standards for Soil** | | | | | 0.38 | 5,200 | 37 | 220 | 400 | 370 | 22 |
| **EPA Region VI Human Health Medium-Specific Screening Levels** | | | | | 0.39 | 5,500 | 39 | 30 | 400 | 390 | NE |

Notes:

1) This table represents detected compounds only
2) For complete analyses and detection limits see the individual laboratory analytical reports
3) Metals analyses by USEPA method 6010 with the exception of Mercury by USEPA method 7471
4) LDEQ RECAP Standards for Soil taken from "Table 2: Management Option 1, Standards for Soil, Non-Industrial Soil" Louisiana Department of Environmental Quality, Risk Evaluation / Corrective Action Program, September 2000
5) EPA Region VI Human Health Medium-Specific Screening Levels taken from "Region 6 Human Health Medium-Specific Screening Levels 2004-2005 Table, Residential Soil," 12/1/2004
6) Hexavalent Chromium used for Soil Standards and Screening Levels
7) mg/kg - milligrams per kilogram
8) **Bold** numbers indicate concentrations above applicable standards and/or screening levels
9) NE indicates chemical Not Established in applicable screening levels

10/21/2005

**DRAFT**

# Table 3-B
## Semivolatile Organic Compounds (SVOCs) Analytical Results

## Subra Company
## Louisiana Sampling
## October 1 and 2, 2005

| Sample | Latitude | Longitude | Collection Date | Matrix | SVOCs: Benzo (k) fluoranthene | SVOCs: Benzo (b) fluoranthene | SVOCs: Benzo (a) anthracene | SVOCs: Benzo (a) pyrene | SVOCs: Chrysene | SVOCs: Fluoranthene | SVOCs: Indeno (1,2,3-cd) pyrene |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | *mm/dd/yy* | | *µg/kg* | *µg/kg* | *µg/kg* | *µg/kg* | *µg/kg* | *µg/kg* | *µg/kg* |
| SS-11 | 29° 59.316' North | 90° 2.386' West | 10/01/05 | Soil | <430 | <430 | <430 | <430 | <430 | <430 | <430 |
| SS-12 | 29° 59.533' North | 90° 2.481' West | 10/01/05 | Soil | 1200 | **1200** | **900** | **1200** | 1500 | 2800 | **720** |
| SS-13 | 29° 38.975' North | 89° 57.699' West | 10/01/05 | Soil | <340 | <340 | <340 | <340 | <340 | <340 | <340 |
| SS-14 | 29° 43.623' North | 90° 7.690' West | 10/01/05 | Soil | <1200 | <1200 | <1200 | <1200 | <1200 | <1200 | <1200 |
| SS-15 | 30° 52.175' North | 89° 68.826' West | 10/02/05 | Soil | <3800 | <3800 | <3800 | <3800 | <3800 | <3800 | <3800 |
| **LDEQ RECAP Standards for Soil** | | | | | 5,500 | 560 | 560 | 330 | 61,000 | 2,000,000 | 560 |
| **EPA Region VI Human Health Medium-Specific Screening Levels** | | | | | 6,200 | 620 | 620 | 62 | 62,000 | 2,300,000 | 620 |

Notes:

1) This table represents detected compounds only
2) For complete analyses and detection limits see the individual laboratory analytical reports
3) SVOC analysis by USEPA 8270
4) LDEQ RECAP Standards for Soil taken from "Table 2: Management Option 1, Standards for Soil, Non-Industrial Soil," Louisiana Department of Environmental Quality, Risk Evaluation / Corrective Action Program, September 2000
5) EPA Region VI Human Health Medium-Specific Screening Levels taken from "Region 6 Human Health Medium-Specific Screening Levels 2004-2005 Table, Residential Soil," 12/1/2004
6) µg/kg - micrograms per kilogram
7) **Bold** numbers indicate concentrations above applicable standards and/or screening levels

10/21/2005

**DRAFT**

# Table 3-C
# Volatile Organic Compounds (VOCs) Analytical Results

## Subra Company
## Louisiana Sampling
## October 1 and 2, 2005

| Sample | Latitude | Longitude | Collection Date *mm/dd/yy* | Matrix | VOCs Naphthalene *µg/kg* |
|---|---|---|---|---|---|
| SS-11 | 29⁰ 59.316' North | 90⁰ 2.386' West | 10/01/05 | Soil | NA |
| SS-12 | 29⁰ 59.533' North | 90⁰ 2.481' West | 10/01/05 | Soil | 12 |
| SS-13 | 29⁰ 38.975' North | 89⁰ 57.699' West | 10/01/05 | Soil | NA |
| SS-14 | 29⁰ 43.623' North | 90⁰ 7.690' West | 10/01/05 | Soil | NA |
| SS-15 | 30⁰ 52.175' North | 89⁰ 68.826' West | 10/02/05 | Soil | NA |
| **LDEQ RECAP Standards for Soil** | | | | | 63,000 |
| **EPA Region VI Human Health Medium-Specific Screening Levels** | | | | | 120 |

Notes:

1) This table represents detected compounds only
2) For complete analyses and detection limits see the individual laboratory analytical reports
3) VOC analysis by USEPA 8260
4) LDEQ RECAP Standards for Soil taken from "Table 2: Management Option 1, Standards for Soil, Non-Industrial Soil," Louisiana Department of Environmental Quality, Risk Evaluation / Corrective Action Program, September 2000
5) EPA Region VI Human Health Medium-Specific Screening Levels taken from "Region 6 Human Health Medium-Specific Screening Levels 2004-2005 Table, Residential Soil," 12/1/2004
6) µg/kg - micrograms per kilogram




© 2005 GOOGLE-MAPDATA © 2005 NAVTEQ™-IMAGERY © 2005 DIGITALGLOBE

ALTAMONT ENVIRONMENTAL, INC.
ENGINEERING & HYDROGEOLOGY
50 COLLEGE STREET, ASHEVILLE, NC 28801
TEL 828.281.3350 FAC 828.281.3351
www.altamontenvironmental.com

APPROXIMATE SAMPLE LOCATIONS
SS-11 & SS-12
DRAFT
NEW ORLEANS, LA

FIGURE 16

DRAWN BY: PAUL DOW
PROJECT MANAGER: JIM MCELDUFF
CLIENT: SUBRA COMPANY
DATE: 10/19/05

SCALE (FEET)
200 0 200 400

FILE PATH: P:\SUBRA\GULF COAST\FIGURES\ SAMPLING LOCATIONS.DWG

SUBRA COMPANY

3814 Old Jeanerette Road, New Iberia, LA 70563 • P.O. Box 9813, New Iberia, LA 70562-9813
Phone 337.367.2216 • Fax 337.367.2217 • E-mail subracom@aol.com

# Agriculture Street Landfill Superfund Site

**By Wilma Subra**
**September 25, 2014**

On behalf of the Concerned Citizens of Agriculture Street Landfill, I served as the technical advisor to the community beginning in 1996. The Environmental Protection Agency funds the Superfund Technical Assistance program to assist community members at Superfund Sites to participate in the Superfund process. I have served as technical advisors at 6 Superfund sites in Louisiana, a number of Superfund sites in Texas and Florida, and pre-superfund sites across the United States.

I have continued to monitor the situation at the Agriculture Street Landfill site up to the present, including extensive sampling on the site and interaction with community member and state and federal regulatory agencies following Hurricane Katrina.

In the handout you have a history of the Agriculture Street Landfill and figures depicting the development on top of the waste in the Landfill. Under the Superfund process EPA divided the Agriculture Street Landfill site into a number of operable unit.

-Operable Unit 1 is the undeveloped area and is depicted on page 2 of the handout as the tree area between Almonaster and St Ferdinand.
-Operable Unit 2 is the residential properties on the site.
-Operable Unit 3 is the Shirley Jefferson Community Center at the corner of Benefit and Press.
-Operable Unit 4 is Moton Elementary School at the corner of Press and Aundance
-Operable Unit 5 Groundwater under and in the landfill debris at the site

The waste in the landfill and contaminating the soil in the yards of the residential area, community center and school contain the following chemicals in excess of acceptable standards.

**Polynuclear Aromatic Hydocarbons**
Benzo(a)anthracene
Benzo(a)prene
Benzo(b)fluoranthene
Benzo(k)fluoranthene
Dibenzo(a,h)anthracene
Indeno(1,2,3-cd)pyrene

**PCBs**
Arochlor 1248
Arochlor 1254
Arochlor 1260

**Heavy Metals**
Arsenic
Beryllium
Chromium
Cobalt
Copper
Lead
Thallium

**Pesticides**
4,4' DDD

**Dioxins and Furans** – these very toxic chemicals are in excess of the newly established EPA standards

The chemicals present at the Agriculture Street site consist of known and suspected cancer causing agents as well as teratogens and mutagens.

After Hurricane Katrina, toxic chemicals were deposited on the site as a result of contaminated sediment sludge carried by the storm surge, and chemicals in the landfill debris that was disrupted as a result of extensive flooding of the site and associated hurricane damage. The undeveloped area waste was flooded by the hurricane flood waters and the flood waters mixed with the waste generated large quantities of leachate that further contaminated the site.

Sampling I performed on the Agriculture Street Site after Hurricane Katrina identified contaminants in excess of acceptable standards

Benzo(a)anthracene
Benzo(a)pyrene
Benzo(b)fluoranthene
Benzo(k)fluoranthene
Indeno(,2,3-cd)pyrene
Arsenic
Dioxin and Furans

The location of the Benzo compounds are depicted in the map on page 8 of the handout.

The area of apartments along Higgins, on both sides of Press were required to be isolated from human contact with fencing following my sampling and additional sampling by EPA.

These chemicals are known and suspected cancer causing agents, mutagens and teratogens.

Additional information on the Agriculture Street Site is presented in the handout.

Contaminants originating from the landfill site as well as waste contaminants carried onto the site by Hurricane Katrina storm surge, continue to be present on and in the Agriculture Street site.

# Agriculture Street Landfill
# Superfund Site

***by Wilma Subra***

The African American community of Agriculture Street lives on top of a municipal and industrial waste landfill in New Orleans East. The City of New Orleans operated the 95 acre landfill from 1909 to 1965. The waste was deposited 17 to 20 feet deep over 95 acres in a marsh area with ground water at or near the land surface. Beginning in the 1970s, the City of New Orleans with HUD financing constructed private and public housing, recreational facilities and an elementary school on 47 acres on top of the landfill. The remaining 48 acres remained undeveloped. The developed area on top of the landfill consists of 67 individually owned homes, 179 rent-to-own townhouses, 128 senior citizen apartments, Moton Elementary School, Press Park Community Center and McGruder Playground.

In December 1994, the Environmental Protection Agency placed the Agriculture Street Landfill on the National Priority List. The landfill and the community living on top of the landfill became a superfund site. The City of New Orleans was named the potentially responsible party by the Environmental Protection Agency. The City of New Orleans refused to participate in the Superfund Process. The State of Louisiana also refused to contribute their financial part of the site clean up. EPA had to use emergency cleanup funds to remediate the site.

The yards of homes on the Agriculture Street landfill were a combination of landfill waste, river sand and some soil. The yard material was contaminated from the surface down to 17 to 20 feet with carcinogenic poly nuclear hydrocarbon such as benzo(a)anthracene, benzo(a)pyrene, benzo(b)fluoranthene, dibenzo(a,h)anthracene and heavy metals arsenic and lead.

The remedy established by EPA only provided for the excavation and replacement of two feet of soil where the soil was exposed. No removal and replacement was planned for under homes, structures, streets and driveways. A calculation of area available for excavation was a mere 10% of the surface area of the developed portion of the landfill. Thus the other 90% will remain contaminated from the surface down to 17 to 20 feet. The contaminated soil and waste are in direct contact with the clean soil and contaminants will migrate and contaminate the clean soils.

Relocation of the entire community would have cost $12 million. The EPA spent more than $20 million to remove and replace 10% of the developed site and placed a foot of soil on the undeveloped portion. And still the community lives on top of a Superfund landfill.

**Community Impacts due to Remedial Activities**

* Total neighborhood disruption
* Quality of life degraded
* Waterline breakage - site flooding, street and property cave-ins
* Backing up of sewage into homes
* Gas lines broken and service disrupted
* Cable TV lines cut on a frequent basis
* Dust deposited inside homes
* Excavated material stockpiled on site adjacent to residential homes
* Children playing in contaminated excavated areas and on stockpiles
* Noise and shaking of homes by excavation equipment

The health impacts experienced by the people living on top of the Agriculture Street Landfill are varied and severe.

In an October 1997 Agency for Toxics Study and Disease Registry health consultation, the rate of breast cancer in women from 1988-1993 was statistically significantly increased. There was a 60% excess of breast cancer in all females and in black females in the census tract that was made up of the Agriculture Street Landfill.

In 1999 a health survey was performed by the community. The most frequent condition was stress due to living on top of a toxic dump: 71% of the individuals in 86% of the households; 41% of the individuals in 49% of the households were on doctor prescribed medication for treatment of the landfill stress.

The second most frequently reported medical condition was breathing problems: 40% of the individuals in 67% of the households experienced asthma, bronchitis, sinus problems, emphysema, and upper respiratory problems.

The third most frequently reported health symptom was dizziness or faint feeling experienced by 29% of the individuals in 66% of the households.

# Exhibit B
# (Photographs)



4/29/16 Abandoned and blighted homes




4/29/16 Abandoned and blighted homes




4/29/16 Abandoned and blighted house with Katrina-era household waste



4/29/16 Abandoned and blighted homes




4/29/16 View from Benefit & Gordon Plaza



4/29/16 Abandoned and blighted house with Katrina-era household waste



4/29/16 Abandoned and blighted school building



4/29/16 Abandoned and blighted school building



4/29/16 Abandoned and blighted homes



5/10/16 Exposed geotextile mat (indicating the interface between fill and contaminated soil)

Registered No. RE078612460US

Date Stamp *

| | | | |
|---|---|---|---|
| To Be Completed By Post Office | Postage $ $1.51 | Extra Services & Fees (continued) | |
| | Extra Services & Fees | ☐ Signature Confirmation $ | |
| | ☐ Registered Mail $ $11.70 | ☐ Signature Confirmation Restricted Delivery $ | |
| | ☐ Return Receipt (hardcopy) $ $2.75 | | |
| | ☐ Return Receipt (electronic) $ $0.00 | Total Postage & Fees $ | |
| | ☐ Restricted Delivery $ $0.00 | | |
| | Customer Must Declare Full Value $ $0.00 | Received by 09/27/2017 | Domestic Insurance up to $50,000 is included based upon the declared value. International Indemnity is limited. (See Reverse). |

OFFICIAL USE

To Be Completed By Customer (Please Print) All Entries Must Be in Ballpoint or Typed

FROM: Lisa Jordan
Tulane Environmental Law Clinic
6329 Freret St, Ste 130
New Orleans, LA 70118

TO: Mayor Mitch Landrieu c/o
Rebecca Dietz, City Attorney
City of New Orleans
1300 Perdido St, N.O. 70112

PS Form 3806, Registered Mail Receipt — Copy 1 - Customer
April 2015, PSN 7530-02-000-9051 — (See Information on Reverse)
For domestic delivery information, visit our website at www.usps.com ®

---

7013 0600 0001 9892 2785

## U.S. Postal Service™ CERTIFIED MAIL™ RECEIPT
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com®

WASHINGTON, DC 20530 — OFFICIAL USE

| | |
|---|---|
| Postage | $ $2.75 |
| Certified Fee | $0.00 |
| Return Receipt Fee (Endorsement Required) | $0.00 |
| Restricted Delivery Fee (Endorsement Required) | $0.00 |
| Total Postage & Fees | $ $1.51 |

Postmark Here — SEP 27 2017 — 09/27/2017

Sent To: Mr. Jefferson Beauregard Sessions, III
U.S. Attorney General
Street, Apt. No.; or PO Box No.: U.S. Dept. of Justice
950 Pennsylvania Ave., N.W.
City, State, ZIP+4: Washington, DC 20530-0001

PS Form 3800, August 2006 — See Reverse for Instructions

---

7013 0600 0001 9892 2778

## U.S. Postal Service™ CERTIFIED MAIL™ RECEIPT
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com®

WASHINGTON, DC 20460 — OFFICIAL USE

| | |
|---|---|
| Postage | $ $2.75 |
| Certified Fee | $0.00 |
| Return Receipt Fee (Endorsement Required) | $0.00 |
| Restricted Delivery Fee (Endorsement Required) | $0.00 |
| Total Postage & Fees | $ $1.51 |

Postmark Here — SEP 27 2017 — 09/27/2017

Sent To: Mr. E. Scott Pruitt
Administrator U.S. EPA
Street, Apt. No.; or PO Box No.: Office of the Administrator, 1101A
1200 Pennsylvania Ave., N.W.
City, State, ZIP+4: Washington, DC 20460

PS Form 3800, August 2006 — See Reverse for Instructions

---

7013 0600 0001 9892 2792

## U.S. Postal Service™ CERTIFIED MAIL™ RECEIPT
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com®

DALLAS, TX 75202 — OFFICIAL USE

| | |
|---|---|
| Postage | $ $2.75 |
| Certified Fee | $0.00 |
| Return Receipt Fee (Endorsement Required) | $0.00 |
| Restricted Delivery Fee (Endorsement Required) | $0.00 |
| Total Postage & Fees | $ $1.51 |

Postmark Here — SEP 27 2017 — 09/27/2017

Sent To: Mr. Samuel Coleman, P.E.
Regional Administrator
Street, Apt. No.; or PO Box No.: U.S. EPA, Region 6
Fountain Pl., 12th Floor, Ste.1200
City, State, ZIP+4: 1445 Ross Avenue
Dallas, TX 75202-2733

PS Form 3800, August 2006 — See Reverse for Instructions

---

7013 0600 0001 9892 2808

## CERTIFIED MAIL™ RECEIPT
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com®

BATON ROUGE, LA 70821 — OFFICIAL USE

| | |
|---|---|
| Postage | $ $2.75 |
| Certified Fee | $0.00 |
| Return Receipt Fee (Endorsement Required) | $0.00 |
| Restricted Delivery Fee (Endorsement Required) | $0.00 |
| Total Postage & Fees | $ $1.51 |

Postmark Here — SEP 27 2017 — 09/27/2017

Sent To: Dr. Chuck Carr Brown, Secretary
LDEQ
Street, Apt. No.; or PO Box No.: P.O. Box 4301
City, State, ZIP+4: Baton Rouge, LA 70821-4303

---

7013 0600 0001 9892 2815

## U.S. Postal Service™ CERTIFIED MAIL™ RECEIPT
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com®

BATON ROUGE, LA 70804 — OFFICIAL USE

| | |
|---|---|
| Postage | $ $2.75 |
| Certified Fee | $0.00 |
| Return Receipt Fee (Endorsement Required) | $0.00 |
| Restricted Delivery Fee (Endorsement Required) | $0.00 |
| Total Postage & Fees | $ $1.51 |

Postmark Here — SEP 27 2017 — 09/27/2017

Sent To: Governor John Bel Edwards
Office of the Governor
Street, Apt. No.; or PO Box No.: P.O. Box 94004
City, State, ZIP+4: Baton Rouge, LA 70804

PS Form 3800, August 2006 — See Reverse for Instructions

*Registered # RE078612460US

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:
Mayor Mitch Landrieu c/o
Ms. Rebecca H. Dietz, City
Attorney
City of New Orleans
1300 Perdido St.
N.O., LA 70112

9590 9403 0580 5183 1698 70

2. Article Number (Transfer from service label)
RE 078 612 460 US

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X [signature] ☐ Agent ☐ Addressee

B. Received by (Printed Name) Counsel

C. Date of Delivery 9/29/17

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
Restricted Delivery
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, April 2015 PSN 7530-02-000-9053 100-001 Domestic Return Receipt

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:
Mr. Jefferson Beauregard
Sessions, III
U.S. Attorney General
U.S. Dept. of Justice
950 Pennsylvania Ave., N.W.
Washington, DC 20530-0001

9590 9403 0580 5183 1699 17

2. Article Number (Transfer from service label)
7013 0600 0001 9892 2785

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X [signature] ☐ Agent ☐ Addressee

B. Received by (Printed Name)

C. Date of Delivery OCT 03 2017

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
Mail Restricted Delivery
0)
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, April 2015 PSN 7530-02-000-9053 190-001 Domestic Return Receipt

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:
Dr. Chuck Carr Brown, Secretary
LDEQ
P.O. Box 4301
Baton Rouge, LA 70821-4303

9590 9403 0580 5183 1698 94

2. Article Number (Transfer from service label)
7013 0600 0001 9892 2808

PS Form 3811, April 2015 PSN 7530-02-000-9053

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X [signature] ☐ Agent ☐ Addressee

B. Received by (Printed Name)

C. Date of Delivery AUG 1 ? 2017

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

190-001

Domestic Return Receipt

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:
Mr. E. Scott Pruitt
Administrator U.S. EPA
Office of the Administrator, 1101A
1200 Pennsylvania Ave., N.W.
Washington, DC 20460

9590 9403 0580 5183 1699 24

2. Article Number (Transfer from service label)
7013 0600 0001 9892 2778

PS Form 3811, April 2015 PSN 7530-02-000-9053

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X Mail Management ☐ Agent ☐ Addressee

B. Received by (Printed Name)

C. Date of Delivery OCT - 2 2017

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

190-001

Domestic Return Receipt

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:
Mr. Samuel Coleman, P.E.
Regional Administrator
U.S. EPA, Region 6
Fountain Pl., 12th Floor, Ste.1200
1445 Ross Avenue
Dallas, TX 75202-2733

9590 9403 0580 5183 1699 00

7013 0600 0001 9892 2792

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X EPA REGION
☐ Agent
☐ Addressee

B. Received by (Printed Name)

C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

OCT 0 2 2017

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
Mail
Mail Restricted Delivery
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, April 2015 PSN 7530-02-000-9053 Domestic Return Receipt

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:
Governor John Bel Edwards
Office of the Governor
P.O. Box 94004
Baton Rouge, LA 70804

9590 9403 0580 5183 1698 87

2. Article Number *(Transfer from service label)*
7013 0600 0001 9892 2815

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X Andrea Crain
☒ Agent
☐ Addressee

B. Received by (Printed Name)
Andrea Crain

C. Date of Delivery
9-29-17

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
Mail
Mail Restricted Delivery
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, April 2015 PSN 7530-02-000-9053 Domestic Return Receipt

EXHIBIT

2

exhibitsticker.com

**CLIENT'S WRITTEN CONSENT FOR APPEARANCES BY LAW STUDENTS**

The Residents of Gordon Plaza, Inc. ("Gordon Plaza"), hereby grants its consent for Tulane Environmental Law Clinic student practitioners to appear on its behalf in any matter in which the Tulane Environmental Law Clinic represents Gordon Plaza. Gordon Plaza gives its consent in accordance with the Court's local rules governing law student appearances.

Dated : 4-25-18

Marilyn S. Amar

By: [Print Name]: Marilyn S. Amar
Address: 80 Gordon Plaza Dr
New Orleans, LA
70126

EXHIBIT

3

exhibitsticker.com

**DEAN'S CERTIFICATION PURSUANT TO LOCAL RULE 83.2.13**

I, David Meyer, am Dean of the Tulane Law School. To the best of my knowledge and belief following reasonable inquiry, Tulane Law Students Colin Casciato, Alexander DeGiulio, Thomas Gosselin, Christopher Halbohn, Talia Nimmer, Allison Skopec, Ashlyn Smith-Sawka, Thomas Steinfeldt, Ryan Sundstrom, Kavan Vartak, Patrick Weis, Morgan Wilson are of good moral character, competent legal ability, and adequately trained to perform as a legal interns.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 8/15/17

David Meyer, Dean
Tulane Law School
6329 Freret St.
New Orleans, LA 70118